# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01355-COA

**JOSHUA CHARLES MILLER A/K/A JOSHUA MILLER**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

DATE OF JUDGMENT:           08/02/2018
TRIAL JUDGE:                HON. PRENTISS GREENE HARRELL
COURT FROM WHICH APPEALED:  LAMAR COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    WILLIAM BONNEY BARDWELL
                            JAMILA ALEXANDER VIRGIL
                            LINDSEY ERIN RUBINSTEIN
ATTORNEYS FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                            BY:  ALICIA MARIE AINSWORTH
NATURE OF THE CASE:         CIVIL - POST-CONVICTION RELIEF
DISPOSITION:                AFFIRMED - 06/02/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., McCARTY AND C. WILSON, JJ.**

**J. WILSON, P.J, FOR THE COURT:**

¶1.     In 1997, Joshua Miller shot and killed thirteen-year-old Kristin Aultman.  Miller was fourteen years old at the time.  He and Aultman had been in an on-again, off-again dating relationship.  Miller shot Aultman in the face at close range with a shotgun because she had begun dating someone else and asked Miller to leave her alone.  After a jury trial, Miller was convicted of deliberate design murder and sentenced to life imprisonment, and his conviction and sentence were affirmed on appeal.  By statute, Miller is not eligible for parole.

¶2.     In 2014, the Mississippi Supreme Court granted Miller's application for leave to file

a post-conviction challenge to his sentence pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). Miller filed a motion in the trial court seeking a new sentence with eligibility for parole. After an evidentiary hearing, the circuit judge found that Miller was not entitled to re-sentencing and denied his motion.

¶3. On appeal, Miller advances a number of arguments that may be summarized as follows: (1) the circuit judge violated Miller's constitutional rights by denying relief without making a specific finding that he is "permanently incorrigible"; (2) the circuit judge applied incorrect legal standards; (3) a jury must determine beyond a reasonable doubt that Miller is "permanently incorrigible" before he can be sentenced to life without parole; (4) the circuit judge erred by requiring Miller to prove that he is entitled to relief under *Miller v. Alabama*; (5) the circuit judge abused his discretion by denying relief; and (6) a sentence of life without parole is unconstitutional in all cases in which the offender was under the age of eighteen at the time of the offense. The Mississippi Supreme Court and this Court have rejected several of these arguments in recent cases. Having considered Miller's remaining claims, we find no error or abuse of discretion, and we affirm the judgment of the circuit court.

## FACTS AND PROCEDURAL HISTORY

¶4. On August 18, 1996, Miller was upset because his former girlfriend Aultman had started dating someone else and told him that she did not want to see him anymore. Miller went to see his friend Elliott Smith to talk about his problems with Aultman. According to Smith, he and Miller walked to a pond near Smith's house, and Miller said, "I'm gonna kill Kristin." However, Smith did not believe that Miller was serious. Miller eventually left

2

Smith's house and went to church.

¶5.   Miller testified at trial that Aultman had broken up with him before. When she had done so previously, he would threaten to "hurt [himself] or [her]" if she did not get back together with him. As he put it, he "was trying to scare her into loving [him], and usually it worked." Miller denied telling Smith that he was going to kill Aultman. According to Miller, he only stated that "in the past, . . . [he] had scared her, and . . . she went back with [him], and . . . maybe [he] could scare her this time" as well. Miller also admitted telling Smith, "[S]ometimes I just feel like killing her." Miller claimed that Smith then suggested that he "do it." Miller told Smith that he had a shotgun with him. Miller claimed that Smith gave him two shotgun shells and helped him load the gun.[1]

¶6.   Miller left Smith's house and went to church. He was driving his family's van.[2] According to Miller, he had told his mother earlier that day that he would keep the nursery for her at church that evening. When he arrived at the church, he saw Aultman sitting in a gazebo with the youth group. According to Miller, Aultman "started looking at [him] kind of mean." Miller then left the church and drove back to Smith's house. He told Smith that he had been unable to talk to Aultman because too many other people were around.

¶7.   Miller eventually returned to the church to try again to talk to Aultman. He found her

---

[1] Smith denied that he gave Miller any shotgun shells. Smith was not questioned specifically about whether he loaded the gun, but he testified, "[H]e told me he had the gun, and he showed me the gun and showed me the shells . . . ." Smith did not believe that Miller was serious about using the gun.

[2] Although Miller was only fourteen years old, he apparently was allowed to drive the family's van near their home in rural Lamar County.

in the sanctuary and said, "I need to talk to you outside." Miller walked back to his van, and Aultman followed him. Miller opened the side door to the van and sat down just inside. Miller asked Aultman what was "wrong" and what had "happened to [them]." Aultman told Miller that there was "nothing between [them] any more," that she did not love him, that she wanted to be with her new boyfriend, and that she wanted him to "leave [her] alone." Miller then reached into the van and picked up his shotgun, which he had placed on the floorboard in the back of the van. He pointed the gun at Aultman and shot her in the face at close range, killing her immediately. At trial, Miller claimed that he only intended to "scare" Aultman but pulled the trigger when he was "startled" by children playing nearby.

¶8.     Miller threw the shotgun into the van, jumped inside, and sped away. He drove back to the pond near Smith's house, but he wrecked the van in a ditch near the pond. Smith had seen Miller's van speeding down the road and ran to meet him. Miller told Smith that he had killed Aultman. Smith then ran back to his house. Smith's father, Gary, testified that Smith was "pretty hysterical" when he got home. Smith told Gary that Miller had killed Aultman, and Gary then told law enforcement where he believed Miller was hiding.

¶9.     Miller hid in the woods near the pond for a short time before walking out. When he came out of the woods, a deputy sheriff told him to put his hands above his head, and Miller stated, "I'm the one that shot her." Deputy Terry Roseberry arrested Miller, told him not to make any more statements, and took him to jail. A few minutes after they arrived at the jail, Miller asked for Roseberry and handed Roseberry a handwritten note. Roseberry testified that Miller must have written the note prior to his arrest because he did not have access to a

4

pen or paper or an opportunity to write after he was arrested. However, Miller claimed at trial that he wrote the note while he was waiting to be questioned. The note read:

Police or anybody who cares:

If you receive this from Joey[3] it probably means I already killed her. I loved her. She didn't. She hurt me. I couldn't take. If she can't be mine, she can't be anybody [sic]. I love God, but Satan has a hold of me. I love you mom. I love Joey, and all my family. What I have done is wrong. Forgive me.

/s/ Josh Miller

¶10. Investigator Fred Steele arrived at the jail a short time later and read Miller his *Miranda* rights. Miller told Steele that he killed Aultman because "[s]he hurt [him] real bad." Steele stopped talking to Miller after Miller's brother telephoned and asked officers not to take any further statements from him.

¶11. A Lamar County jury found Miller guilty of deliberate design murder, and the circuit court sentenced him to life imprisonment. Miller's conviction and sentence were affirmed on appeal. *Miller v. State*, 740 So. 2d 858, 867 (¶39) (Miss. 1999). By statute, Miller is not eligible for parole. Miss. Code Ann. § 47-7-3(1)(f) (Supp. 2019).

¶12. In 2012, the United States Supreme Court held "that *mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Miller v. Alabama*, 567 U.S. at 465 (emphasis added). As the Mississippi Supreme Court has stated, "*Miller* does not prohibit sentences of life without parole." *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013).

---

[3] Joey was Miller's best friend. Miller testified that earlier in the day he wanted to talk to Joey about his problems with Aultman. However, Joey was not at home, so he went to talk to Elliott Smith instead.

But it does require the sentencing authority to take into account "several factors" related to the offender's age before imposing such a sentence. *Id.*

¶13. In 2014, the Mississippi Supreme Court granted Miller leave to file a motion for post-conviction relief (PCR) challenging his sentence under *Miller v. Alabama*. Miller filed a PCR motion asking the trial court to re-sentence him to life imprisonment with eligibility for parole. The trial court held an evidentiary hearing on Miller's motion in 2018.

¶14. Miller's mother, Teresa Hartfield, testified that Miller's father was physically abusive to her and her children and a serial adulterer. Nonetheless, she also testified that Miller was close to his father and was devastated when his father left them when Miller was seven years old. Hartfield testified that she was committed to a psychiatric facility for a time after the separation because she was depressed and suicidal. Miller was sent to live with an aunt during that time. Hartfield remarried when Miller was ten years old, and she testified that her new husband was also physically and verbally abusive. Hartfield admitted that she was combative and responsible for some of the violence in her home. Hartfield described Miller as a good child who helped her around the house, had a part-time job, and never caused problems. He also made good grades and was in the gifted program at school.

¶15. Miller's aunt, Letitia Hudson, generally corroborated Hartfield's testimony regarding Miller's father, stepfather, and home life. Hudson and her husband gave Miller a part-time job at their drugstore, and they found him to be conscientious and a hard worker. Hudson thought that Miller "needed approval and acceptance," which he did not get at home.

¶16. Miller also called two friends who knew him prior to the murder. They both described

6

him as smart and funny and were surprised when they heard that he had killed Aultman.

¶17.    Emmitt Sparkman, a former deputy commissioner for the Mississippi Department of Corrections (MDOC), testified about Miller's conduct during his incarceration based on a review of Miller's MDOC records.  Sparkman testified that Miller was involved in a gang and had a number of incidents of misconduct after he arrived at Parchman, which was "not unusual."  However, Miller had withdrawn from the gang and had gone for ten years without engaging in violent behavior or receiving a rule violation report, which Sparkman said was uncommon for an inmate serving a long sentence.  Sparkman also testified that Miller had been reclassified as a "medium custody" inmate based on good conduct.  Sparkman explained that this was the lowest risk classification for an inmate serving a life-without-parole sentence, which indicates that "the [MDOC] does not view [Miller] as a high risk inmate."  Sparkman testified that Miller's conduct had improved over time even though he is ineligible for most academic and vocational programs due to his sentence.

¶18.    Dr. Criss Lott, a clinical and forensic psychologist, testified about his interview and assessment of Miller.  Lott testified that at the time of the offense, Miller was a "typical" youth, "a gifted kid," and "a straight A student."  Lott also noted that Miller was described as a "class clown," who sometimes engaged in "silly," "foolish," or "impulsive" behavior. Miller "did not exhibit . . . violent, aggressive behavior . . . other than, obviously, this horrible offense."  Miller had been diagnosed with ADHD and prescribed Ritalin but was taken off the medicine at some point.  Lott thought it was "a mistake" to take him off the medicine if it helped him with his impulse control.  Lott also testified that it was "more likely

7

than not" that Miller's home life "affected him emotionally." Although Miller's home was not in conflict "seven days a week," "maybe once a week . . . or once a month" "big emotional blowups" would take place. Miller's effective abandonment by his father also impacted him negatively.

¶19. Lott opined that Miller's crime was "impulsive" even though there was evidence that he planned to kill Aultman and deliberated about the murder for a period of hours. Lott noted that Miller did not have a youth court record prior to the offense. Lott also testified about brain development generally and the relevant factors under *Miller v. Alabama*. Lott opined that Miller was capable of rehabilitation and was not the sort of permanently incorrigible offender who should be sentenced to life without parole.

¶20. At the conclusion of the hearing, Miller read a prepared statement. He expressed regret for the murder and apologized to the Aultman family. He told the judge that he was a different person than when he committed the murder, he maintained that he was capable of rehabilitation, and he asked for a chance at parole.

¶21. Following the evidentiary hearing, the judge issued an opinion analyzing the *Miller* factors and finding that Miller was not entitled to a new sentence. The judge's ruling is discussed in more detail below. Miller filed a notice of appeal.

## ANALYSIS

¶22. On appeal, Miller argues that (1) the circuit judge violated Miller's constitutional rights by denying relief without specifically finding that he is "permanently incorrigible"; (2) the circuit judge applied incorrect legal standards; (3) before Miller can be sentenced to life

8

without parole, a jury must find beyond a reasonable doubt that he is "permanently incorrigible"; (4) the circuit judge erred by requiring Miller to prove that he was entitled to relief under *Miller v. Alabama*; (5) the circuit judge abused his discretion by denying relief; and (6) a sentence of life without parole is unconstitutional in all cases in which the offender was under the age of eighteen at the time of the offense.

¶23.    In a series of recent decisions, the Mississippi Supreme Court and this Court have rejected arguments (1),[4] (3),[5] (4),[6] and (6).[7]  Therefore, this case requires no new discussion of those issues.  We address Miller's remaining contentions that the circuit judge applied

---

[4] "[I]n *Montgomery* [*v. Louisiana*, 136 S. Ct. 718 (2016)], the [United States Supreme Court] specifically stated that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility' and that '*Miller* did not impose a formal factfinding requirement.'"  *Cook v. State*, 242 So. 3d 865, 876 (¶39) (Miss. Ct. App. 2017) (quoting *Montgomery*, 136 S. Ct. at 735), *cert. denied*, 237 So. 2d 1269 (Miss. 2018), *cert. denied*, 139 S. Ct. 787 (2019); *accord McGilberry v. State*, 292 So. 3d 199, 206-07 (¶¶30-31) (Miss. 2020); *Wharton v. State*, No. 2017-CT-00441-SCT, 2019 WL 6605871, at *4 (¶25) (Miss. Dec. 5, 2019);  *Chandler v. State*, 242 So. 3d 65, 69 (¶15) (Miss. 2018), *cert. denied*, 139 S. Ct. 790 (2019); *Jones v. State*, No. 285 So. 3d 626, 632 (¶17) (Miss. Ct. App. 2017), *cert. granted*, 250 So. 3d 1269 (Miss. 2018), *cert. dismissed*, No. 2015-CT-00899-SCT, 2018 WL 10700848 (Miss. Nov. 29, 2018), *cert. granted*, 140 S. Ct. 1293 (2020).  The United States Supreme Court recently granted certiorari in *Jones* to decide whether the Eighth Amendment to the United States Constitution requires a finding that a juvenile offender is "permanently incorrigible" before a life-without-parole sentence can be imposed.  Miller filed a motion to stay this case until the United States Supreme Court issues its decision in *Jones*.  Miller's motion to stay is denied.  This case was briefed, argued, and submitted for decision prior to the grant of certiorari in *Jones*, which has not yet been briefed or argued in the United States Supreme Court.  Miller may continue to raise this issue in a motion for rehearing.

[5] *McGilberry*, 292 So. 3d at 206-07 (¶¶30-32); *Wharton*, 2019 WL 6605871, at *3 (¶19); *Cook*, 242 So. 3d at 876 (¶¶38-40).

[6] *Wharton*, 2019 WL 6605871, at *4-5 (¶¶25-26); *Cook*, 242 So. 3d at 873 (¶25).

[7] *McGilberry*, 292 So. 3d at 205-06 (¶¶25-27); *Cook*, 242 So. 3d at 877-78 (¶45).

incorrect legal standards (i.e., misapplied *Miller v. Alabama*) and abused his discretion by denying relief. We combine our discussion of these two closely related issues.

¶24. In *Miller v. Alabama*, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits the "mandatory" imposition of a life-without-parole sentence if the offender was under the age of eighteen at the time of his offense. *Miller*, 567 U.S. at 465. "*Miller* does not prohibit sentences of life without parole." *Parker*, 119 So. 3d at 995 (¶19). But it does require the judge "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* (quoting *Miller*, 567 U.S. at 480). *Miller* also identified several factors that a judge must consider:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id.* at 995-96 (¶19) (citations omitted) (quoting *Miller*, 567 U.S. at 477-78).

¶25. The burden is on the offender to convince the judge that the *Miller* factors collectively prohibit a sentence of life without the possibility of parole. *Wharton*, 2019 WL 6605871, at *4 (¶25). "If the offender persuades the judge that the *Miller* factors preponderate in favor

10

of parole eligibility, then the judge must declare the offender parole eligible." *Cook*, 242 So. 3d at 873 (¶27). "If, however, the judge determines that *Miller* does not mandate parole eligibility, then the judge *must* deny relief because the Legislature has provided by law that persons convicted of murder are not eligible for parole." *Id.* at 873-74 (¶27); *see also Stromas v. State*, 618 So. 2d 116, 123 (Miss. 1993) ("It is the [L]egislature's prerogative, and not this Court's, to set the length of sentences.").

¶26. "[T]here are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Chandler*, 242 So. 3d at 68 (¶7). Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.* In short, "the judge in a *Miller* case is bound to consider and apply [the *Miller*] factors in a non-arbitrary fashion." *Cook*, 242 So. 3d at 873 (¶27).

¶27. In this case, Miller was afforded a full and fair evidentiary hearing. He was represented by two skilled attorneys, and he had expert testimony from a clinical and forensic psychologist and a former deputy commissioner of the MDOC. Furthermore, the judge made detailed findings of fact addressing the *Miller* factors in support of his decision.

¶28. Miller was fourteen years and seven months old when he killed Aultman. Dr. Lott described him as a "typical" fourteen-year-old in terms of maturity, but the judge found that other evidence indicated a somewhat higher degree of maturity. For example, Miller was a dependable worker at his part-time job, he was allowed to drive his family's van, he kept the nursery at his church, and he took on other responsibilities at home. The judge found that

11

"[t]he factor of immaturity did not weigh in favor of granting the relief requested," and we find no manifest error or abuse of discretion in this finding.

¶29. The judge also found that there was no evidence that the murder was an impulsive or impetuous act.[8] As the judge noted, there was substantial evidence that Miller planned the murder in advance. He sought out Smith earlier in the day and discussed his problems with Aultman. Miller said to Smith that he was considering killing Aultman, though Smith did not think that Miller was serious. Miller also discussed how he might hide or get away after the murder. Miller then went looking for Aultman, taking a loaded shotgun with him. He found her and drew her out to the side of his van, where he had left the shotgun. When Aultman again told Miller that she had a new boyfriend and wanted Miller to "leave [her] alone," Miller picked up the shotgun, pointed the gun at Aultman's face at close range, and pulled the trigger. Finally, the note that Miller wrote (*see supra* ¶9) indicates advance

---

[8] The dissent asserts "that the trial judge failed to properly consider Dr. Lott's medical evidence and testimony . . . pertaining to the impulsiveness of Miller's actions at the time of the offense." *Post* at ¶46. The dissent also claims that "the trial judge[] . . . failed to consider the evidence of Miller's untreated ADHD at the time of the offense relative to the impulsiveness of his actions." *Id.* However, the judge specifically addressed Dr. Lott's testimony and opinions at several points in the court's detailed findings of fact and conclusions of law. The judge also specifically discussed that Miller had stopped taking Ritalin for his ADHD about six months prior to the crime, as well as his mother's testimony that "he became more easily angered" after he stopped taking Ritalin. The judge simply found that there was no evidence that Miller acted impetuously or impulsively *when he murdered Aultman*. The judge's factual finding is supported by substantial evidence that Miller planned the killing in advance, discussed his plans with a friend, and even wrote a letter to another friend disclosing his plan to murder Aultman. The fact that Miller had ADHD or may have had some impulsive tendencies does not necessarily show that *the murder* was impulsive. The judge considered all of the relevant evidence, including Dr. Lott's testimony and Miller's ADHD diagnosis. The dissent's narrow critique of the circuit judge's thorough opinion does not identify any reversible error.

12

planning and deliberation on his part. While Miller claimed that the note was written after the murder, its language and the testimony of Deputy Roseberry contradict that claim. In addition, the trial jury found Miller guilty of deliberate design murder, rejecting his contention that the killing was only manslaughter. In short, there is substantial evidence to support the judge's finding that the murder was planned, not impulsive.

¶30. The judge next found that Miller appreciated the risks and consequences of his actions and that his youth did not adversely affect him after he was arrested and charged. The judge found that Miller had used the shotgun before and clearly understood its purpose as a deadly weapon. Law enforcement did not interrogate Miller, and the facts of the murder were largely undisputed. The State did not offer a manslaughter plea deal, and Miller made an informed decision to go to trial on the hope that the jury would find him guilty of manslaughter instead of murder.

¶31. The judge acknowledged that Miller had a troubled home life, including a father who was abusive and then abandoned him and a stepfather who was verbally abusive. The judge also considered Dr. Lott's testimony that those issues could have adversely affected Miller. However, the judge found that Miller was a good student, a good worker, and an otherwise seemingly normal teenager despite his issues at home. The judge found that Miller's home life was similar to that of the offender in *Jones*, *supra*, another case in which the trial judge denied relief under *Miller v. Alabama* and this Court affirmed on appeal. *See Jones*, 285 So. 3d at 630, 634 (¶¶7-10, 22).

¶32. Importantly, the judge found that there was no evidence that family or peer pressure played any role in Miller's decision to murder Aultman. Miller suggested at trial and in his

13

interview with Dr. Lott that his friend, Elliott Smith, somehow encouraged the killing. However, Smith's trial testimony contradicted that claim. The evidence supports the trial judge's finding that Miller made the decision to murder Aultman all by himself and without any encouragement from anyone else.

¶33. Finally, as to the possibility of rehabilitation, the judge considered and discussed the testimony of Dr. Lott, Sparkman, and Miller's mother, aunt, and friends. Citing *Hudspeth v. State*, 179 So. 3d 1226, 1228 (¶10) (Miss. Ct. App. 2015), the judge also acknowledged that he lacked "clairvoyance" regarding Miller's capacity for rehabilitation. *See also Cook*, 242 So. 3d at 873 (¶26) ("[T]he United States Supreme Court has given the sentencing judge in a *Miller* case a difficult, if not impossible, task."). However, after considering all of the evidence presented, the judge did not find that the possibility of rehabilitation weighed in favor of granting a new sentence in this case.

¶34. Having reviewed the judge's detailed opinion and findings, we cannot say that the judge committed any abuse of discretion. The judge afforded Miller a full and fair evidentiary hearing, the judge applied the proper legal standard by considering each of the *Miller* factors, and he rendered a decision based on those factors that was neither arbitrary nor capricious.

¶35. Miller also argues that the circuit judge applied an incorrect legal standard by requiring Miller to prove that he would not re-offend if released from prison rather than properly applying the *Miller* factors. Miller points to comments that the judge made during the hearing about the likelihood that Miller would re-offend. Miller also cites the judge's statement that he lacked "clairvoyance" regarding Miller's capacity for rehabilitation. We

14

disagree with Miller's contention. We review the judge's written ruling and findings of fact, not isolated comments made before the close of the evidence. *Cf. Hill v. Hinds County*, 237 So. 3d 838, 844 (¶21) (Miss. Ct. App. 2017) ("Mississippi's longstanding rule is that a court's written decision trumps its oral one."). In addition, the judge in *Hudspeth*, *supra*, made the same candid comment about his lack of "clairvoyance." This honest concession does not indicate that the judge failed to apply the *Miller* factors. Rather, the judge's written ruling shows that he considered this factor and the relevant evidence, as required by *Miller*.

¶36. Finally, Miller advances a series of related arguments that the circuit judge applied an incorrect legal standard because he failed to recognize that each of the *Miller* factors should weigh in favor of parole eligibility in all or the vast majority of *Miller* cases. Again, we disagree with Miller's characterization of the circuit judge's ruling. The judge fairly considered the evidence presented that was relevant to each of the *Miller* factors. Miller simply disagrees with the weight and relative importance that the judge assigned to the relevant evidence and factors in his case. As stated above, the judge's ultimate decision was not an abuse of discretion.

## CONCLUSION

¶37. The circuit judge applied the correct legal standards and did not err or otherwise abuse his discretion by finding that Miller was not entitled to relief under *Miller v. Alabama*. Miller's remaining arguments are foreclosed by precedent of the Mississippi Supreme Court and this Court.

¶38. **AFFIRMED.**

**BARNES, C.J., GREENLEE, McCARTY AND C. WILSON, JJ., CONCUR.**

15

**LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶39. I concur with the majority in holding "the judge afforded Miller a full and fair evidentiary hearing, he applied the proper legal standard by considering each of the *Miller* factors, and he rendered a decision based on those factors that was neither arbitrary nor capricious." Maj. Op. at ¶34. I believe the circuit court's findings clearly support the court's sentence, and it appears that the court found that Miller was irreparably corrupt or permanently incorrigible. However, the judge's order did not specifically set forth the determination that Miller was irreparably corrupt or permanently incorrigible. I write separately to express my concerns about our current precedent holding that a circuit court does not have to articulate that finding on the record before sentencing a juvenile to life imprisonment.

¶40. The United States Supreme Court has held that the Eighth Amendment bars life-without-parole sentences for the "vast majority of juvenile offenders" and permits this extraordinary punishment only for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016). Further, in *Montgomery v. Louisiana*, the United States Supreme Court stated, "[The fact that] *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole." *Miller* and *Montgomery* held that the only time it is constitutional to sentence a juvenile to a life without

16

parole sentence is when it is proven that the juvenile is irreparably corrupt or permanently incorrigible.

¶41.   In *Cook v. State*, this Court held that the trial courts are not required to make a written finding of fact regarding a juvenile's incorrigibility. *Cook v. State*, 242 So. 3d 865, 876 (¶39) (Miss. Ct. App. 2017), *cert. denied*, 237 So. 3d 1269 (Miss. 2018), *cert. denied*, 139 S. Ct. 787 (2019).  More recently, in *Chandler v. State*, our supreme court, with a five-justice majority, held that the United States Supreme Court's holding in *Miller v. Alabama*[9] only requires a sentencing authority to hold "a hearing" and "consider[] and tak[e] into account" a set of factors related to youth before imposing a life-without-parole sentence on a child. *Chandler v. State*, 242 So. 3d 65, 68-70 (¶¶8, 12, 21) (Miss. 2018).

¶42.   In his dissent in the *Chandler* case, Chief Justice Waller stated the following:

> *Miller* established that a life-without-parole sentence is an unconstitutionally disproportionate punishment for juvenile homicide offenders whose crimes reflect transient immaturity and can be imposed only on those children whose crimes reflect permanent incorrigibility. *Id*.  The United States Supreme Court left to the States the task of ensuring that their sentencing procedures satisfy this holding, and to do this, our trial courts must apply the facts of each particular case to the substantive law.

*Id*. at 72 (¶2) (Waller, C.J., dissenting).  As explained in the dissent, the United States Supreme Court's *Miller* holding left the procedural aspect of compliance to the individual states.  Seven state supreme courts have held that as a necessary procedural safeguard, trial courts should be required to make determinations on the record that a defendant is permanently incorrigible.  Because the only time a constitutional sentence of life without

---

[9] 567 U.S. 460, 132 S. Ct. 2455, 183 (2012).

parole can be imposed on a juvenile is when they are that "rare" offender who has demonstrated irreparably corrupt behavior or permanent incorrigibility, Justice Waller argued that trial courts ought to be required to make "an on-the-record finding." *Id*.

¶43.    Seven of the eleven state supreme courts that have addressed the "incorrigibility requirement" have held a trial judge must make a specific finding of incorrigibility before sentencing a juvenile to life without parole.[10]  Mississippi is only one of four states that has held an oral or written finding of fact of incorrigibility is not required.[11]  In other words, at present, we require our circuit courts to conduct a sentencing hearing and listen to and evaluate the evidence presented at that hearing under the factors mandated by *Miller*.  The circuit court can then sentence a juvenile to life without parole only if it finds that the juvenile is irreparably corrupt or permanently incorrigible.  However, under our present state of the law, even though a circuit court can constitutionally sentence a juvenile to life without parole after considering the *Miller* factors and finding the juvenile is irreparably corrupt or permanently incorrigible, the court does not have to articulate that finding on the record. Yet, that life without parole sentence is only constitutional if the circuit court found that the

---

[10] Harvard Law Review, *Criminal Law—Life Sentences Without Parole—Supreme Court of Mississippi Affirms a Sentence of Life Without Parole for a Juvenile Offender*, 132 Harv. L. Rev. 1756 n.67 (April 10, 2019).  These states include Arizona, Florida, Georgia, Oklahoma, Pennsylvania, Illinois, and Iowa. *Id.*; *e.g.*, *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017); *People v. Holman*, 91 N.E.3d 849, 863 (Ill. 2017); *Veal v. State*, 784 S.E.2d 403, 411 (Ga. 2016).

[11] *See Life Sentences Without Parole*, *supra* note 10, at 1762 n.67.  "The Virginia, Tennessee, Michigan, and now Mississippi state supreme courts have explicitly held that a finding of incorrigibility is not required." *Id.* (citing *People v. Skinner*, 917 N.W.2d 292, 309 (Mich. 2018)).

18

juvenile was irreparably corrupt or permanently incorrigible. The one essential element necessary to make that life-without-parole sentence constitutional is missing from the court's written order. With that language missing, we are left to guess or presume that the circuit court actually found that which is required. When a juvenile is facing a life-without-parole sentence, guesses and presumptions should not bring doubt upon the safeguards of the legally mandated and constitutionally required sentencing process.

¶44. Requiring an on-the-record finding by the circuit court which affirms that a juvenile is permanently incorrigible is not too much to ask when those sentences are supposed to be reserved for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734. The safer practice, and not too burdensome of a requirement, would be to mandate that circuit courts clearly state what they are constitutionally required to find before sentencing a juvenile to life without parole—is this juvenile one of those rare offenders whose crimes have demonstrated that he or she is irreparably corrupt or permanently incorrigible? Because the United States Supreme Court has required that those standards be proved before a life-without-parole sentence can be legally imposed, it would seem prudent and of sound practice to require it to be found on the record either by a ruling from the bench or in a written order. Then, there would be no more guessing as to whether the circuit court indeed found that which is constitutionally required. While the written orders and any on-the-record comments may allow us to surmise that is what the court found, the need to surmise would be greatly curtailed if the court had expressed what it is legally required to find to ensure the constitutionality of the sentence imposed.

19

¶45. The findings of fact a circuit court is constitutionally required to make before sentencing a juvenile to life without parole should be free of doubt or guessing. I would find that the circuit court should have made an on-the-record finding that Miller was one of the rare juvenile offenders whose crime reflected permanent incorrigibility before sentencing him to life without parole.

**McCARTY, J., JOINS THIS OPINION.**

**CARLTON, P.J., DISSENTING:**

¶46. I disagree with the majority's finding that the trial judge in this case fairly considered the evidence and testimony presented with regard to each *Miller* factor, and I therefore respectfully dissent. After my review, I find that the trial judge failed to properly consider Dr. Lott's medical evidence and testimony regarding the adolescent brain, as well as Dr. Lott's testimony regarding how Miller's untreated ADHD affected his brain, as pertaining to the impulsiveness of Miller's actions at the time of the offense. The record reflects that the trial judge found that there was no evidence that the murder was an impulsive or impetuous act. However, the trial judge's order reflects that he failed to consider the evidence of Miller's untreated ADHD at the time of the offense relative to the impulsiveness of his actions when analyzing Miller's potential for rehabilitation. I would therefore reverse and remand with instructions for the trial judge to consider Dr. Lott's medical evidence regarding these factors.

¶47. Our supreme court has recognized that *Miller* "requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Parker v. State*, 119 So. 3d 987, 995

(¶19) (Miss. 2013) (quoting *Miller*, 567 U.S. at 480). *Miller* also set forth several factors that a sentencing authority must consider before imposing a sentence of life without parole on a juvenile offender, *id.*, which the majority opinion sets forth in full. This separate opinion limits its discussion to two of those factors: (1) Miller's "chronological age and its hallmark features . . . [of] immaturity, impetuosity, and failure to appreciate risks and consequences" and (2) "the possibility of rehabilitation." *See id.* at 995-96 (¶19).

¶48.    "[W]e review a [trial] judge's sentencing decision under *Miller* only for an abuse of discretion." *Cook v. State*, 242 So. 3d 865, 872 (¶23) (Miss. Ct. App. 2017). The sentencing authority "must consider the factors discussed in *Miller*[] and . . . must 'apply those factors in a non-arbitrary fashion.'" *Jones v. State*, 285 So. 3d 626, 632 (¶17) (Miss. Ct. App. 2017) (quoting *Cook*, 242 So. 3d at 873 (¶27)). This Court has recognized that in so doing, "the sentencing judge is not required to make any specific 'finding of fact.'" *Id*.

¶49.    In this case, the record reflects that Dr. Lott, an expert witness in clinical and forensic psychology for children, adolescents, and adults, interviewed Miller over the course of two days. Dr. Lott then produced a report of his findings, which included an analysis on each factor set forth in *Miller* and *Parker*. Dr. Lott also testified at Miller's post-*Miller* sentencing hearing regarding his findings.

¶50.    After the hearing, the trial judge entered an order denying Miller's motion for re-sentencing. In his order, the trial court discussed the *Miller* factors and the evidence and testimony presented at the hearing relating to each factor. As to Dr. Lott's findings and testimony regarding the *Miller* factor of Miller's chronological age and its features of immaturity, impetuosity, and failure to appreciate risks and consequences, the trial judge

21

acknowledged that Dr. Lott "opined that the data he obtained in the evaluation of Mr. Miller showed that 'Mr. Miller's age at the time of the offense, his developmental immaturity, impulsivity/impetuosity, and failure to appreciate risks and consequences were significant factors in the commission of his offense.'" The trial judge stated that he found no evidence that Miller's act of murdering Aultman was an impulsive or impetuous act; rather, the trial judge found that "there was substantial evidence that Miller planned the murder in advance." Maj. Op. at ¶29.

¶51.  As to the factor examining Miller's possibility of rehabilitation, the trial judge acknowledged Dr. Lott's statement that it "cannot be argued with certainty that Mr. Miller represents one of those 'rare' offenders who are incapable of rehabilitation" and Dr. Lott's opinion that "Miller is clearly capable of rehabilitation." However, the trial judge ultimately found that "the factor of rehabilitation does not favor granting the relief requested."

¶52.  In his order, however, the trial judge does not mention any of the testimony or evidence presented by Dr. Lott regarding Miller's diagnosis of ADHD or Dr. Lott's testimony regarding the effect of an ADHD diagnosis on the adolescent brain. The trial judge's order also does not reflect any consideration of Dr. Lott's testimony that at the time of the offense, the part of Miller's brain that regulates and controls behavior was underdeveloped.

¶53.  A review of Dr. Lott's testimony regarding the *Miller* factor of chronological age and its features of immaturity, impetuosity, and a failure to appreciate risks and consequences reflects that Dr. Lott discussed brain development during adolescence. Dr. Lott testified that during adolescence, "the area of the brain that controls emotions, mood, and anger, the limbic

22

system is developing at a greater rate" than the "piriform cortex," which is the part of the brain that controls and regulates behavior. Dr. Lott testified that during adolescence, the piriform cortex is "underdeveloped," but it "begins to catch up and probably does around the age of 24 or 25." However, Dr. Lott explained that while the piriform cortex is developing during adolescence, "it causes significant problems in adolescents because of the discrepancy or the disconnect . . . between EQ, emotional quotient and IQ intelligence." As a result of this underdevelopment in the piriform cortex, Dr. Lott explained that adolescents are "more sensation seeking. They're quick to do things that they're emotionally motivated to do rather than risk aversive. They don't think about consequences." Dr. Lott testified that "if an adolescent is under duress or stress, you're likely to see a much more inappropriate response as you would if someone else who is also emotionally stressed at 25, but their response may be different in an interpersonal relationship."

¶54. Dr. Lott stated that Miller's age at the time of the offense was significant because adolescence is the time when "the emotional part of the brain is developing," and "[y]ou're dealing with . . . other biological issues including testosterone," and this combination of issues "is complicating problems with respecting impulsivity[.]" Dr. Lott explained that the interaction of testosterone "exacerbates" or "aggravates" impulsivity. Dr. Lott testified that in reviewing Miller's specific case, he saw evidence of issues with impulse control and attention seeking and sensation seeking.

¶55. The record shows that Miller was diagnosed with ADHD when he was seven or eight years old. Dr. Lott and Miller's mother both testified that at one point, Miller was receiving treatment for his ADHD in the form of medication (Ritalin). Dr. Lott opined that Miller was

23

doing "very well" with that treatment. Dr. Lott acknowledged that he did not see the doctor's report from the Hattiesburg Clinic regarding Miller's treatment, so he admitted that he "[did not] know if this is correct."

¶56. Miller's mother testified that at the time of the offense, Miller was no longer taking his Ritalin. Miller's mother stated that "we took him off of Ritalin about six months before" Aultman's murder. As to the testimony about Miller's discontinuing his medication, Dr. Lott opined that "it's an absolute mistake for someone to tell an adolescent male to discontinue medication at puberty. . . . I've been doing this 30 years, and I've never heard of that. That was a mistake." Dr. Lott testified that Miller should have remained on the medication because "[i]t was working. It had been effective. The medications in his case helped with an impulse control and behavioral issues."

¶57. Dr. Lott also testified that with regard to Miller's ADHD diagnosis, it was significant to note that Miller "never received any behavioral or programming or treatment from the local mental health professional." Dr. Lott explained that behavioral treatment for children with ADHD is important, even if they are on medication, because "they need to learn coping strategies to help deal with and address mutability, emotional outburst, behavioral issues, and it should have included . . . [the parents]." Dr. Lott opined that Miller's absence of behavioral treatment for his ADHD "contributed to his lack, I think, of behavior control." Dr. Lott stated that if Miller had been receiving "more of a multi-mode of treatment with both medication, behavioral treatment with family treatment and then his mother and he may have been better equipped to deal with certain emotional problems that he was confronted with."

24

¶58. Dr. Lott stated that based on Miller's school records and test scores, Miller was considered a gifted student. Dr. Lott testified that studies have shown that children with ADHD who are also gifted have more difficulty "with the terms of the emotional control, an impulsive acting out, and behavior control," and "they tend to be more at risk for doing and saying things that may be a little bit off color or inappropriate."

¶59. As to Dr. Lott's testimony regarding the *Miller* factor of the possibility of rehabilitation and whether Miller was permanently incorrigible, the record reflects that Dr. Lott testified at the time of the offense, he would not define Miller as the type of juvenile offender that is described as "incorrigible" in youth court. Dr. Lott explained that the phrase "incorrigible" was used in youth court "because . . . we would see repeated patterns of misbehavior." Dr. Lott testified, however, that the label of incorrigible "doesn't mean that those individuals . . . are not capable of being rehabilitated or treated[.]" Dr. Lott opined that at the time of the offense, Miller "did not exhibit that violent, aggressive behavior" of someone who is permanently incorrigible and lacks the ability to be rehabilitated—other than the "horrible offense" of murdering Aultman. Significant to the factor of rehabilitation, Dr. Lott also testified that at the time of the offense, "[t]here was no indication . . . that [Miller] was incapable of receiving treatment" for his ADHD.

¶60. Upon review, I find that the trial judge's order fails to reflect any of Dr. Lott's testimony or evidence regarding the adolescent brain or how Miller's ADHD affected his brain at the time of the offense. The trial judge's order also fails to reflect any consideration of the possibility of rehabilitation if Miller received treatment for his ADHD. I therefore find that the trial court abused its discretion by failing to fully consider the medical evidence

presented by Dr. Lott regarding Miller's age and impulsivity at the time of the offense and Miller's possibility of rehabilitation. *See Cook*, 242 So. 3d at 872 (¶23). Accordingly, I would reverse the trial judge's order and remand this matter with instructions for the trial judge to fully consider Dr. Lott's medical testimony and evidence as pertaining to these two *Miller* factors.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**